UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x

UNITED STATES OF AMERICA,

      against-

FRANCISCO MALDONADO-GUZMAN,

      Defendant.

———————————————————————— x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/12/2022

21 CR 448 (CM)

DECISION AND ORDER DENYING DEFEDNANT'S MOTION TO DISMISS

McMahon, J.:

      Francisco Maldonado Guzman ("Maldonado") is charged in the instant Indictment with unlawful entry into the United States subsequent to a conviction for the commission of a felony, in violation of 8 U.S.C. § Section 1326(a) and (b)(1). Before the Court is Maldonado's motion to dismiss the indictment, pursuant to Rule 12 of the Federal Rules of Criminal Procedure, on the ground that Title 8 U.S.C. § 1326, violates the equal protection guarantee of the Fifth Amendment.

      Background

      In 2004, Maldonado, a citizen of Mexico, pleaded guilty to aggravated criminal contempt, in violation of New York Penal Law 215.52, and was sentenced to nine months' imprisonment. In April 2005, an immigration judge ordered Maldonado's removal. On May 3, 2005, he was removed to Mexico. On an unknown date after May 3, 2005, Maldonado illegally reentered the United States without having received permission from the Attorney General of the United States or the Secretary of Homeland Security to reenter the United States. In January 2018, he was arrested in Manhattan

1

for criminal trespass in the third degree. On July 12, 2021, he was charged in the instant Indictment with unlawful entry into the United States subsequent to a conviction for the commission of a felony, in violation of Section 1326(a) and (b)(1).

    Defendant's Motion

    Maldonado contends that the sole charge against him—illegal reentry—must be dismissed because the 1929 legislation creating the statute was enacted with a discriminatory purpose, the taint of that discriminatory purpose has never been purged from subsequent revisions to the statute, and the application of the law has had a disparate impact on Mexicans and other Latinx peoples.

    The Government opposes the motion arguing that (1) immigration laws are subject to a highly deferential standard of review, requiring the defendant to negate "every conceivable basis which might support" the legislation, which it contends defendant has not done; (2) Supreme Court precedent prohibits courts from probing alleged illicit legislative motives; and (3) even if the Court were to probe the justifications of Congress' immigration actions as the defendant requests, applying the discriminatory intent test outlined in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), the motion would fail.

    As a threshold matter, the Court need not address the parties' disagreement concerning the applicable standard of review because Maldonado's motion fails under the more demanding standard of *Arlington Heights*. *See United States v. Suquilanda*, No. 21 Cr. 263 (VM), 2021 WL 4895956, at *5 n.3 (S.D.N.Y. Oct. 20, 2021) ("Because the Court would reject [defendant]'s argument under the strict standard of *Arlington Heights*, the Court need not conclude which level of review applies.").

    The Fifth Amendment provides that "[n]o person shall ... be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. "[T]he Due Process Clause of the

2

Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups." *Washington v. Davis*, 426 U.S. 229, 239 (1976). A facially neutral statute, such as the one at issue here, can violate equal protection principles if it has (1) a racially disparate impact, and (2) a "racially discriminatory intent or purpose" served as "a motivating factor" in its enactment. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265–66 (1977). The party asserting that a "law was enacted with discriminatory intent" carries the burden of proof. *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018). If the challenging party can carry that burden, the statute is reviewed under strict scrutiny. *See Hunt v. Cromartie*, 526 U.S. 541, 546 (1999). If the evidence of discriminatory intent is inadequate, the constitutional inquiry ends. *Arlington Heights*, 429 U.S. at 271.

Under the *Arlington Heights* framework, the historical context of a legislative enactment is one relevant factor for courts to consider in evaluating whether racial animus was a motivating factor in the legislation's passage. *See United States v. Wence*, No. 20-CR-0027, 2021 WL 2463567, at *5-6 (D.V.I. June 16, 2021). The Supreme Court's decisions in *Ramos* and *Espinoza*, although rendered outside the context of an equal protection challenge, confirm this very point and "support the contention that subsequent enactments of a statute do not erase its historical context." *United States v. Santos-Reynoso*, No. 21-CR-268-LTS, 2022 WL 2274470, at *3 (S.D.N.Y. June 23, 2022) citing, *United States v. Rios-Montano*, No. 19-CR-2123-GPC, 2020 WL 7226441, at *4 (S.D. Cal. Dec. 8, 2020) (describing impact of the decisions); *see also United States v. Hernandez-Lopez*, No. H-21-440, 2022 WL 313774, at *6 (S.D. Tex. Feb. 2, 2022) ("In both cases, the Court acknowledged that the laws had a discriminatory history, and this inquiry is included in the *Arlington Heights framework*."). However, courts examining the "enduring taint theory," have cautioned that the discriminatory motives underlying the passage of a previous statute, while

relevant, are not "determinative of the outcome of an *Arlington Heights* analysis of a law enacted by a subsequent legislature." *Id.*, citing, *Hernandez-Lopez*, 2022 WL 313774, at \*6; see also Rodriguez-Arevalo, 2022 WL 1542151, at \*5 (same); *Viveros-Chavez*, 2022 WL 2116598, at \*6 (explaining relevance of prior Congress' intent to passage of subsequent legislation). Rather, *Arlington Heights* "directs the Court to look at the motivation behind the official action being challenged, which is not the 1929 Act" in this case, "but rather § 1326 from the 1952 INA." *United States v. Sanchez-Felix*, No. 21-CR-310, 2021 WL 6125407, at \*5 (D. Colo. Dec. 28, 2021); Crespo-Castelan, 2022 WL 2237574 at \*3 ("Evidence of prior discriminatory intent, however, cannot satisfy [Defendant's] burden of establishing that [section] 1326 was enacted, or later modified, with a discriminatory purpose.").

Maldonado's challenge to 18 U.S.C. § 1326 is one of many similar challenges that defendants have filed across the United States after a single ruling by a court sitting in the District of Nevada. In *United States v. Carrillo-Lopez*, 555 F. Supp. 3d 996 (D. Nev. 2021), the District Court granted the defendant's motion to dismiss an indictment charging him with illegal reentry, concluding that the defendant had shown that § 1326 was enacted with a discriminatory purpose, had a disparate impact on Latinx persons, and violated the Fifth Amendment's guarantee of equal protection under the law. Since the *Carrillo-Lopez* decision was issued, district courts across the United States, including three courts sitting in this District, have found the *Carrillo-Lopez* decision to be an "outlier" and have upheld § 1326 as constitutional. *United States v. Suquilanda*, No. 21-CR-263-VM, 2021 WL 4895956, at \*5 (S.D.N.Y. Oct. 20, 2021) (finding "there are no equal protection issues here" as the Court was "not persuaded [movant], or any other criminal defendant in the many cases rejecting such arguments, has carried [their] burden of showing Section 1326 was enacted, or later modified, with discriminatory intent"); *United States v. Crespo-Castelan*, No.

4

22-CR-009-JFK, 2022 WL 2237574, at *1 (S.D.N.Y. June 22, 2022) ("agree[ing] with the Government and conclud[ing] that [Defendant] ... failed to allege an equal protection claim" with respect to Section 1326); *United States of America v. Yenny Santos Reynoso, No. 21-CR-268-LTS, 2022 WL 2274470, at *2–6 (S.D.N.Y. June 23, 2022)* (same)*; see also United States v. Viveros-Chavez*, No. 21-CR-665, 2022 WL 2116598, at *1, 8-9 (N.D. Ill. June 13, 2022) (noting "[e]very court to decide this issue has rejected the constitutional challenge, except for one court in the District of Nevada"). Indeed, on June 13, 2022, a district court siting in the District of Nevada issued a decision disagreeing with the *Carrillo-Lopez* opinion and "follow[ing] the reasoning of the majority of courts" who have determined that insufficient evidence was proffered to find that Section 1326 was enacted with racial animus as a motivating factor. *United States v. Alfredo Salas-Silva*, No. 20-CR-54-RCJ-CLB, 2022 WL 2119098, at *3-4 (D. Nev. June 13, 2022).

Like other defendants who have pursued this issue previously, Maldonado argues that the historical background and legislative history of the Undesirable Aliens Act of 1929 ("UAA")—the precursor of the unlawful reentry provision codified in the 1952 Immigration and Nationality Act ("INA" also known as the McCarran-Walter Act of 1952)—proves his point that the current illegal reentry statute was enacted with racist intent. In support of his argument, Maldonado offers the scholarly declarations of Professor Eric Fish and Professor Deborah Kang (the same declarations submitted on behalf of defendants who have sought this same relief in other district courts across the nation). Professor Fish describes the congressional debate leading up to the passage of the UAA, as a compromise between the "nativists" seeking to exclude Hispanic immigrants and the "agricultural industry" seeking to ensure its "continued use of exploitable laborers from Mexico" by way of "punish[ing] and deport[ing] laborers once their work was done." (Mem. at 10 (citing Wheeler Decl., Ex. A at 12-16)). The professor's declaration is replete with instances of racist and

5

xenophobic statements made by various congressman when debating the 1929 law, like this rant by then Congressman of Georgia, Charles Edwards:

> Hordes of undesirable immigrants from Mexico are coming into the United States. I have seen it stated that anywhere from 65,000 to 100,000 Mexicans are annually coming over the border into this country. As a rule, they are not the better or higher-type Mexicans, but generally of the less desirable type, and in many cases the criminal and diseased element. Something must be done to stop this. . . . "This ignorant and undesirable element pouring into the United States from Mexico, not only do not understand American ideals, but many of them come into our country with hatred in their hearts for America and Americans. . . . Let's be just and fair to our own Republic and not poison her institutions with the riff-raff and scum of other countries who will not, and cannot, from the very nature of things, become one of us because they have no conception of Americanism.

*Id.* at 13.[1]

Under the *Arlington Heights* framework, the historical context of a legislative enactment is one relevant factor for courts to consider in evaluating whether racial animus was a motivating factor in the legislation's passage. *See United States v. Wence*, No. 20-CR-0027, 2021 WL 2463567, at *5-6 (D.V.I. June 16, 2021). There is no question that the UAA has a "dark history," and "at least some members of Congress were motivated to criminalize reentry because of their support for eugenics and opposition to the increased presence of the 'Mexican race' in the United States." *Hernandez-Lopez*, 2022 WL 313774, at *3. However, the discriminatory motivations behind the enactment of this earlier statute, while relevant, are of limited probative value to the evaluation of the constitutionality of § 1326. Twenty-three years passed between the passage of the UAA and the INA, and "only thirty congressmen from the [1929] Congress remained in office in 1952." *See Viveros-Chavez*, 2022 WL 2116598, at *8; *Sanchez-Felix*, 2021 WL 6125407, at *6 (finding the "views of congressional members in 1929 [to be of] less probative value in

---

[1] Shamefully, Representative Edwards would probably find like-minded elected officials in the 117th Congress.

determining the views of members of Congress in 1952, who passed [section] 1326"). Therefore, the historical context leading to the passage of the UAA is quite "remote" from the factors leading to the enactment of the INA. *Hernandez-Lopez*, 2022 WL 313774, at *5 (finding history of UAA to be "remote from the 1952 Congress" and thus its probative value "limited"). Moreover, although both statutes criminalized unlawful reentry, there are "key substantive differences" between the two statutes "that establish that section 1326 is not a mere reenactment of the UAA." *Viveros-Chavez*, 2022 WL 2116598, at *5 (explaining the expanded factual predicates triggering Section 1326 and other linguistic differences). For example, § 1326 permits noncitizens to avoid prosecution by obtaining advanced authorization for their reentry by the Attorney General, while the UAA contained no such provision and, in contrast, was "absolute in barring reentry." *Id.*

Thus, although the UAA provides some helpful context to the historical background of the unlawful reentry statutes, it does not establish "the motivation behind the official action being challenged"– namely § 1326 of the 1952 INA. *Ponce-Galvan*, 2022 WL 484990, at *3; *United States v. Muria-Palacios*, No. 21-CR-23-JAM, 2022 WL 956275, at *2 (E.D. Cal. Mar. 30, 2022) (explaining the Court must focus on the "official action being challenged[,]" namely "Section 1326 ... not the repealed 1929 Act"); *Suquilanda*, 2021 WL 4895956, at *5 (explaining that the UAA "was undoubtedly enacted in the face of bald racial animus .... [b]ut this evidence bears little weight on section 1326"); *United States v. Sifuentes-Felix*, No. 21-CR-337-WJM, 2022 WL 293228, at *2 (D. Colo. Feb. 1. 2022) (same).

Maldonado argues that racial animus against people of Latin America persisted in Congress and continued to be a motivating factor behind the passage of the INA. In this regard, he relies on the declaration of Professor Kang. Professor Kang says that between the passage of the UAA in 1929 and the passage of the INA in 1952, Mexican made up the overwhelming number persons

prosecuted under the act, and nearly 500,000 undocumented Mexicans were repatriated. Kang says

that the "Bracero Program" (created during this period, purportedly, to provide Mexican workers

with better working conditions) was riven by abuse and discrimination. As direct evidence of

Congress' continued discriminatory motives against Latin American peoples when legislating in

the area of immigration, Kang points to Congress' contemporaneous consideration of the INA and

the so-called "Wetback Bill" (which would "criminaliz[e] the harboring of non-citizens"). Kang

points to statements made by Senator Pat McCarran, who co-authored the INA, in which he

"referred to both legal and undocumented Mexicans as "wetbacks" during appropriations hearings

in 1951 and 1952 (but not during the deliberations on §1326); a statement from Senator Allen

Ellender "complain[ing] about the strictures imposed by the Bracero Program," around the same

time period; and statements from representatives made during discussions about whether to

eliminate the "national origins quota system" from the INA. Kang suggests as further proof that he

INA was enacted with a discriminatory purpose Congress' decision to enact the INA over the veto

of President Harry Truman, "who explicitly called out the law for its racism," and a letter from

Attorney General Ford explaining his views on the proposed legislation and incorporating the racial

slur, "wetback," in support of his position. (Wheeler Decl., Ex. B).

These proffers are relevant to the extent they elucidate the historical context in which

§ 1326 was enacted. However, historical background is only one factor of the *Arlington Heights*

standard. Although the statements made by a handful of legislators around the time period of the

INA's passage are deeply disturbing, the Court recognizes that these statements were not made

about § 1326 specifically, and "cannot be used to ascribe intent to the other hundreds of members

of Congress." *Viveros-Chavez*, 2022 WL 2116598, at *8. Nor does the Court find the statements

made by President Truman or Attorney General Ford to be particularly probative, as they were not

8

members of Congress who voted on the INA, and thus their views provide "no direct insight into the motivations of the 1952 Congress [that] passed the law." *Salas-Silva*, 2022 WL 2119098, at *3 (citation omitted). Moreover, not only have courts "cautioned that statements by a bill's opponents are not probative of Congress's motives," and thus President Truman's veto statement is of limited probative value, but the veto statement was not specifically about § 1326 or the bill's "treatment of immigrants from Latin America" but, rather, concerned the "INA's continued use of the quotas that disfavored immigrants from Asia and southern and eastern Europe." *Id.*; *see also Viveros-Chavez*, 2022 WL 2116598, at *8 (explaining that "President Truman did not mention § 1326 in the veto statement, nor did he say anything about the INA arising from a desire to target Latinos or Mexicans").

Furthermore, the Court recognizes that Congress has amended § 1326 several times since its original enactment in 1952 in order to "increase [Section 1326's] deterrent value[,]" *Salas-Silva*, 2022 WL 2119098, at *4, and "with nary a word suggesting discriminatory animus to those of Latin American descent." *United States v. Calvillo-Diaz*, No. 21-CR-445, 2022 WL 1607525, at *11 (N.D. Ill. May 20, 2022). Professor Kang submits that "during the 1988, 1990, 1994, and 1996 legislative debates," about the amendments, "lawmakers made no effort to acknowledge and/or amend the racial animus that informed earlier iterations of this provision." (Wheeler Decl. Ex. B at 34). The Court declines to adopt defendant's argument that Congressional silence is automatically indicative of discriminatory intent. "It is just as plausible that Congress, instead of deliberately ignoring the discriminatory animus underlying the 1929 criminalization of illegal entry or disingenuously papering over it, was aware of that history and nonetheless thought that retaining [section] 1326 and stiffening its penalties was consistent with the objectives" of the INA. *Calvillo-Diaz*, 2022 WL 1607525, at *11; *Salas-Silva*, 2022 WL 2119098, at *4 (explaining "there is the

necessary presumption of good faith in these amendments, especially in light of the fact that Congress has numerous legitimate motivations for enacting and preserving Section 1326").

Even assuming § 1326 has "had a disparate impact on Mexicans and other Latinx peoples since its inception," the Court finds that Maldonado's evidentiary proffer insufficient to establish under the *Arlington Heights* standard that discriminatory animus was a motivating factor in the enactment of the statute.  No hearing is necessary.

This constitutes the decision and order of the Court.

July 12, 2022

Colleen McMahon
United States District Court Judge